IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRUCE BARR, et al.,                    :

     Plaintiffs                    :

v.                                    :          Civil Action No. GLR-16-3556

FLAGSTAR BANK, FSB,                    :

     Defendant.                    :

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant Flagstar Bank, FSB's ("Flagstar") Motion to Dismiss (ECF No. 11). This case arises out of Plaintiffs Bruce and Anne Barr's (the "Barrs") attempts to modify their mortgage loan, which is serviced by Flagstar. The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2016). For the reasons outlined below, the Court will grant the Motion.

## I.     BACKGROUND[1]

### A.     The Loan and Foreclosure Action

The Barrs are the owners of a property located at 416 Chesapeake Avenue, Stevensville, Maryland (the "Property"), which they purchased in March 2005. (Am. Compl. ¶ 29, ECF No. 8). On June 26, 2007, the Barrs refinanced the mortgage (the

---

[1] Unless otherwise noted, the Court describes facts taken from the Amended Complaint and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations omitted).

"Loan") on the Property with Residential Mortgage Solutions, Inc. for $413,000.00, at which time Flagstar became the loan's servicer. (Id. ¶ 30).

The Barrs fell behind on their mortgage during the economic down turn of 2008. (Id. ¶¶ 31–33). In April 2009, in an attempt to keep the Property, Mr. Barr filed for bankruptcy. (Id. ¶ 34). A few months later, in June 2009, Flagstar sent the Barrs a letter demanding they vacate the Property by July 2009. (Id. ¶ 35). The Barrs vacated the Property, moving to Texas to live with family. (Id.). The Barrs ultimately returned to Maryland in November 2009, although they lived with relatives and not at the Property. (Id. ¶ 36).

In March 2010, the Barrs received a letter from Flagstar regarding a possible modification for the Loan. (Id. ¶ 37). On the advice of a Flagstar representative, the Barrs moved back into the Property in March 2010 and made it their primary residence. (Id. ¶ 38). The Barrs then submitted a loan modification application. (Id.). Nevertheless, in May 2010, the Barrs received a letter from Flagstar notifying them of a scheduled foreclosure sale on the Property on June 15, 2010. (Id. ¶ 40). The Barrs then learned that Flagstar had denied their requested loan modification because the Property was not the Barrs' primary residence. (Id.). The Property was sold, but, in July 2010, the Circuit Court for Queen Anne's County, Maryland vacated the sale. (Id. ¶ 41). The Circuit Court further ruled that the Barrs should be eligible for a Home Affordable Modification Program ("HAMP") loan modification. (Id.).

In October 2010, the Barrs submitted to Flagstar the HAMP loan modification paperwork. (Id.). Flagstar denied the Barrs' loan modification in December 2010.

(Id. ¶ 42). The Barrs again went to the Circuit Court, and the court ordered the Barrs and Flagstar to "resolve the loan modification issue." (Id. ¶ 43).

**B.      Trial Period Plans and Loan Modification Agreements**

In order to keep the Property, the Barrs entered into three Trial Period Plan ("TPP") agreements with Flagstar, with the first TPP agreement beginning in August 2011. (Id. ¶¶ 44, 47, 56). The terms of the TPP agreements stipulated that the Barrs' loan would be permanently modified if the Barrs made three required monthly payments and complied with all other conditions. (Id. ¶¶ 44, 47, 56).

On or about March 26, 2015, the Barrs entered into their third TPP agreement (the "Third TPP Agreement") with Flagstar, under which the Barrs were obligated to make three monthly payments of $2,499.74, with the first payment due on May 1, 2015. (Id. ¶ 56). The Barrs made the required payments. (Id. ¶ 58).

On July 13, 2015, Flagstar sent the Barrs "a package containing two letters and a Loan Modification Agreement" (the "Original LMA"). (Id. ¶ 59). The first letter stated that the Barrs' "Modification Payment Amount" under the Original LMA was $2,508.73 and explained how to accept the offered loan modification (the "First How to Accept Letter"). (Id. ¶ 60). The second letter explained that the Modification Payment Amount "included modified principal and interest payment[s] and escrow payments including taxes and insurance." (Id. ¶ 61). The Barrs rejected the Original LMA. (See id. ¶¶ 62–64).

On September 18, 2015, Flagstar sent the Barrs a Revised Loan Modification Agreement (the "Revised LMA"). (Id. ¶ 64). The cover letter accompanying the Revised

LMA stated that the Modification Payment Amount was $2,041.43 and explained how to accept the loan modification offer (the "Second How to Accept Letter"). (Id. ¶ 65). The Second How to Accept Letter instructed the Barrs to return two signed and notarized copies of the Revised LMA along with $2,041.43 to accept the offer. (Id.). The Second How to Accept Letter also stated that the Revised LMA would not be effective until both the Barrs and Flagstar signed it. (Def.'s Mot. Dismiss ["Def.'s Mot."] Ex. E ["2d How to Accept Letter"] at FLAG0057, ECF No. 11-6).[2] On September 28, 2015, the Barrs returned executed copies of the Revised LMA and the required payment. (Am. Compl. ¶ 67). On October 7, 2015, a Flagstar representative signed the Revised LMA. (Def.'s Mot. Ex. F ["Executed LMA"], ECF No. 11-7). Almost a year later, on August 24, 2016, Flagstar returned a fully executed copy of the Revised LMA to the Barrs. (Am. Compl. ¶ 85).

From September 2015 through January 2016, the Barrs made monthly payments of $2,041.43. (Id. ¶¶ 69, 76). During the same period of time, Flagstar sent the Barrs mortgage statements which stated that the required monthly payment was $2,833.45, that the Barrs' payments of $2,041.43 were only partial payments, and that Flagstar had not applied these payments to the Barrs' account. (Id. ¶ 69).

On December 17, 2015, Flagstar sent the Barrs a corrected modification agreement (the "Corrected LMA"), which provided that the modified monthly payments would be $2,501.43. (Id. ¶¶ 71–72). The Barrs rejected the Corrected LMA, considering

_____

[2] The Second How to Accept Letter and the Revised LMA are part of the same document, Exhibit E to Flagstar's Motion (ECF No. 11-6).

the Revised LMA the binding contract between them and Flagstar. (Id. ¶ 74). On January 19, 2016, Flagstar sent the Barrs a mortgage statement reflecting that $234,009.39 was past due, the interest rate on the loan was 6.875%, the payment due date was August 1, 2009, and added a $118.31 late fee. (Id. ¶ 75). The statement also explained that the Barrs previous payments were partial payments, which were unapplied to their balance, and threatened foreclosure. (Id.). After receiving this mortgage statement, the Barrs tendered $2,041.43 as payment. (Id. ¶ 76). Flagstar refused the payment. (Id.).

## C.    Qualified Written Requests

On December 15, 2015, the Barrs sent to Flagstar the first of two letters, which they allege are Qualified Written Requests ("QWRs") under the Real Estate Settlement Procedures Act ("RESPA"). (Id. ¶ 70). The December 15, 2015 letter (the "December 2015 Letter") requested a long list of documents related to the Loan's ownership and requested that their account be "reconciled" because "recent mortgage account statements do not accurately reflect payments [the Barrs] continued to remit pursuant to [their] loan modification agreement." (Def.'s Mot. Ex. I ["Dec. 15, 2015 Letter"], ECF No. 11-10). Flagstar responded to the Barrs' December 2015 Letter on February 2, 2016. (Am. Compl. ¶ 77; Def.'s Mot. Ex. K ["1st Resp."], ECF No. 11-12). In its response, Flagstar stated that the Barrs' monthly payment amount was $2,682.61, the unpaid principal balance on the Loan was $413,000.00, and the interest rate was 6.875%. (Am. Compl. ¶ 77; 1st Resp. at FLAG00172). Flagstar also noted that the Barrs were required

to return the executed Corrected LMA and closing funds by November 6, 2015. (Am. Compl. ¶ 77; First Resp. at FLAG00175).

On March 1, 2016, the Barrs sent Flagstar a second letter and "Notice of Error," this time through counsel (the "March 2016 Letter") (collectively, with the December 2015 Letter, the "Letters"). (Am. Compl. ¶ 79; Def.'s Mot. Ex. L ["Mar. 1, 2016 Letter"], ECF No. 11-13). The March 2016 Letter stated that there were errors in a January 19, 2016 account statement and requested several documents. (Am. Compl. ¶ 79; Mar. 1, 2016 Letter). On April 1, 2016, Flagstar responded to the March 2016 Letter with over 200 pages of documents. (Def.'s Mot. Ex. N ["2d Resp."], ECF No. 11-15).

## D.    **The Barrs Sue Flagstar**

On October 26, 2016, the Barrs commenced suit against Flagstar. (ECF No. 1). On January 20, 2017, Flagstar filed its first Motion to Dismiss. (ECF No. 5). In response, on February 23, 2017, the Barrs filed an Amended Complaint, alleging the following counts: Fraud (Count I); violations of the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law ["CL"] §§ 13-301(1), (3), (4) (West 2018) (Count II); violations of the Maryland Mortgage Fraud Protection Act ("MMFPA"), Md. Code Ann., Real Prop. ["RP"] § 7-402 (West 2018) (Count III); violations of RESPA, 12 U.S.C. § 2605(e) (2018) (Count IV); violations of the Maryland Consumer Debt Collection Act ("MCDCA"), CL §§ 14-202(8) (West 2018) (Count V); Breach of Contract (Count VI); and violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 (2018) and Regulation Z, 12 C.F.R. § 1026 (2018) (Count VII). (ECF No.

8). Ms. Barr also brings a single count against Flagstar for the violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681a(d) (2018) (Count VIII). The Barrs seek compensatory damages, statutory damages, punitive damages, and attorneys' fees and costs. (Am. Compl. ¶¶ 109, 117, 128, 135, 142, 152, 159). On March 23, 2017, Flagstar filed its Motion to Dismiss. (ECF No. 11). On April 28, 2017, the Barrs filed a Response. (ECF No. 17). Flagstar filed a Reply on May 13, 2017. (ECF No. 20).

## II. DISCUSSION

### A. <u>Standard of Review</u>

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." <u>King v. Rubenstein</u>, 825 F.3d 206, 214 (4th Cir. 2016) (quoting <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243–44 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. <u>Goss v. Bank of Am.,</u>

N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd sub nom., Goss v. Bank of Am., NA, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cty., 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But, the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

Several of the Barrs' claims implicate the heightened pleading standard under Rule 9(b). Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed.R.Civ.P. 9(b). This particularity standard requires the plaintiff to "describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." Galante v. Ocwen Loan Servicing LLC, No. ELH-13-1939, 2014 WL 3616354, at *9 (D.Md. July 18, 2014) (quoting United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co., 612 F.3d 724, 731 (4th Cir. 2010)).

**B.**     <u>Analysis</u>

**1.**     **Relevant Materials and Allegations**

Before reaching the merits of Flagstar's Motion, the Court must determine which extra-pleading materials the Court can consider in assessing it and address the Barrs' attempts to amend their Amended Complaint through their Opposition.

### i.     Documents Attached to Flagstar's Motion

At bottom, the Court concludes that it can consider the Revised LMA, the Second How to Accept Letter, the Barrs' December 2015 and March 2016 Letters, and Flagstar's responses to the Letters because they were integral to and explicitly relied on in drafting the Amended Complaint.

Generally, "a court may not consider extrinsic evidence at the 12(b)(6) stage." <u>Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC</u>, 794 F.Supp.2d 602, 611 (D.Md. 2011). If, however, "a defendant attaches a document to its motion to dismiss, 'a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.'" <u>Id.</u> (alterations in original) (quoting <u>Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare Inc.</u>, 367 F.3d 212, 234 (4th Cir. 2004)). An integral document is a one that by its "very existence, and not the mere information it contains, gives rise to the legal rights asserted." <u>Walker v. S.W.I.F.T. SCRL</u>, 517 F.Supp.2d 801, 806 (E.D.Va. 2007). In the event that any properly considered extra-pleading materials conflict with the "bare allegations of the complaint," the extra-pleading materials "prevail." <u>Fare Deals Ltd. v. World Choice Travel.com, Inc.</u>, 180 F.Supp.2d 678, 683 (D.Md. 2001)

(citing <u>Fayetteville Inv'rs v. Commercial Builders, Inc.</u>, 936 F.2d 1462, 1465 (4th Cir. 1991)).

In the context of fraud claims, courts' concern over examining documents outside of the complaint—lack of notice to the plaintiff—is mitigated where the plaintiff has "actual notice" and has "relied upon" the documents "in framing the complaint." <u>Trigon</u>, 367 F.3d at 234 (quoting <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1426 (3d Cir. 1997)). This rule is meant to prevent a plaintiff from maintaining a fraud claim by "extracting an isolated statement from a document and placing it in the complaint, even though in the full context of the document it would be clear that the statement is not fraudulent." <u>Id.</u> (quoting <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d at 1426).

In this case, Flagstar attached several documents as exhibits to its Motion, including the Revised LMA, the Second How to Accept Letter, the Barrs' December 2015 and March 2016 Letters, and Flagstar's responses to the Letters.[3] The Barrs do not dispute the authenticity of any of these documents. In fact, the Barrs cite to them in their Opposition. All that remains, then, is for the Court to determine whether they were integral to and explicitly relied on in drafting the Amended Complaint. And, for claims that sound in fraud, whether the Barrs had actual notice of a document's contents. The Court considers the documents in turn.

First, because the Revised LMA is the contract upon which the Barrs base their breach of contract claim and the Barrs detail several of its terms in the Amended

---

[3] Flagstar attached the same documents to its first Motion to Dismiss. (<u>See</u> Mot. Def. Flagstar Dismiss Compl. Exs. A–N, ECF Nos. 5-2 through 5-15). The Barrs, therefore, had access to these documents before filing their Amended Complaint.

Complaint, the Court concludes that it can consider the Revised LMA.  See Chesapeake Bay, 794 F.Supp.2d at 611; Walker, 517 F.Supp.2d at 806.

Second, the Barrs' common law fraud claim, and MCPA and MMFPA claims, which are also claims that sound in fraud, are based on a statement contained in the Second How to Accept Letter—the Modification Payment Amount.  As a result, it is an integral document.  See Chesapeake Bay, 794 F.Supp.2d at 611; Walker, 517 F.Supp.2d at 806.  In addition, the Barrs quote from the Second How to Accept Letter in the Amended Complaint.  Therefore, they have actual notice of its contents and explicitly relied on it in drafting the Amended Complaint.  See Trigon, 367 F.3d at 234 (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1426).  Thus, the Court concludes that it can examine the Second How to Accept Letter in its entirety.

Third, because the Barrs specifically reference the December 2015 Letter and March 2016 Letter in the Amended Complaint and the Letters provide the basis for the Barrs' RESPA claims, the Court concludes that it can consider them.  See Chesapeake Bay, 794 F.Supp.2d at 611; Walker, 517 F.Supp.2d at 806.

Finally, the Amended Complaint does not contain specific details regarding Flagstar's responses or attach Flagstar's responses as exhibits.  The Barrs plead, however, that Flagstar violated RESPA because it failed to "fully respond . . . or provide the requested documentation." (Am. Compl. ¶ 132).  The Barrs, therefore, relied on Flagstar's responses in drafting their Amended Complaint.  The Barrs would not be able to state that Flagstar's responses were insufficient if they had not received them.  Further, because Flagstar's allegedly deficient responses provide the basis for the Barrs' RESPA

claims, they are integral to the Amended Complaint. See Walker, 517 F.Supp.2d at 806. Thus, the Court concludes that it can consider Flagstar's responses.

### ii. Amending Pleadings through Briefs

The Barrs attempt to lodge new allegations against Flagstar in their Opposition brief. Because plaintiffs cannot amend their pleadings through briefs, the Court concludes that it will only consider the allegations contained in the Amended Complaint.

Federal Rule of Civil Procedure 15(a)(1)(B) provides that "[a] party may amend its pleading once as a matter of course within . . . 21 days after service of a motion under Rule 12(b)." In their Response, the Barrs assert four new allegations. First, as to their breach of contract claim, they allege that Flagstar breached the Revised LMA by "failing to modify the loan" and suffered damages in the form of late fees due to Flagstar's failure to apply their monthly payments to the unpaid balance of the Loan. (Pls.' Mem. Opp'n Def.'s Mot. Dismiss ["Pls.' Opp'n"] at 25, ECF No. 17). Second, as to their common law fraud claim, the Barrs allege that Flagstar had an affirmative duty to disclose that the Modification Payment Amount did not include escrow payments, and Flagstar fraudulently concealed this fact. (Id. at 19). Third, as to their MCPA claim, the Barrs assert that Flagstar failed to disclose the material fact that the Modification Payment Amount supposedly no longer included escrow payments. (Id. at 23). Fourth, as to their RESPA claim, the Barrs complain that Flagstar's investigation of the errors the Barrs identified in their Letters was not reasonable. (Id. at 30).

The Barrs, however, did not include these allegations in their Amended Complaint. Instead, the Barrs simply added the new allegations to their Response. The

Court may not consider these new allegations. See Zachair, Ltd. v. Driggs, 965 F.Supp. 741, 748 n.4 (D.Md. 1997) (holding that a plaintiff is "bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), aff'd, 141 F.3d 1162 (4th Cir. 1998). Thus, the Court will only consider the claims contained in the Barrs' Amended Complaint.

### 2. The Barrs' Claims

Flagstar moves to dismiss the Barrs' fraud, MCPA, MMFPA, RESPA, MCDCA, and breach of contract claims under Rule 12(b)(6) on the grounds that they fail to plausibly state a claim. Because the Barrs' common law fraud and state statutory claims are based, in part, on the contract between the parties—the Revised LMA—the Court begins with the breach of contract claim.

### i. Breach of Contract Claims (Count VI )

At bottom, the Court concludes that it will dismiss the Barrs' breach of contract claim based on Flagstar accepting their $2,041.43 payments as partial payments.

To establish a breach of contract claim, the plaintiff must allege: (1) "that the defendant owed the plaintiff a contractual obligation"; and (2) "that the defendant breached that obligation." Palermino v. Ocwen Loan Servicing, LLC, No. TDC-14-0522, 2015 WL 6531003, at *4 (D.Md. Oct. 26, 2015) (quoting Taylor v. NationsBank, N.A., 776 A.2d 645, 651 (Md. 2001)).

The Barrs plead three purported breaches of the Revised LMA on Flagstar's part: (1) accepting the Barrs' $2,041.43 payments only as partial payments; (2) "failing to timely return or record the Revised [LMA]"; and (3) sending the Barrs mortgage

statements alleging they are "in default on the terms of the loan." (Am. Compl. ¶ 145). Flagstar argues that the Barrs' breach of contract claim should be dismissed to the extent that it is premised on Flagstar's failure to apply the Barrs' partial payments because Flagstar had no contractual obligation to accept the $2,041.43 payments as full payments. The Court, therefore, will only assess the Barrs' partial payment claim.

Flagstar contends that the Barrs' partial payment claim is grounded in a misinterpretation of the Revised LMA. Specifically, Flagstar asserts that the Revised LMA did not eliminate the Barrs' obligation to make escrow payments. The Court agrees.

> a.     **The Relationship Between the Revised LMA and Other Documents**

First, the Court must determine whether to consider the Third TPP Agreement and Second How to Accept Letter when interpreting the Revised LMA. In brief, the Court will not examine the Third TPP Agreement. The Court will only consider the Revised LMA and Second How to Accept Letter.

"The fundamental rule in the construction and interpretation of contracts is that the intention of the parties as expressed in the language of the contract controls the analysis." Ford v. Antwerpen Motorcars Ltd., 117 A.3d 21, 25 (Md. 2015) (quoting Curtis G. Testerman Co. v. Buck, 667 A.2d 649, 654 (Md. 1995)). Maryland follows the law of objective interpretation of contracts, which gives plain meaning to the unambiguous language of the agreement. DIRECTV, Inc. v. Mattingly, 829 A.2d 626, 632 (Md. 2003). This type of interpretation considers "what a reasonably prudent person in the same

position would have understood as to the meaning of the agreement." <u>Cochran v. Norkunas</u>, 919 A.2d 700, 709 (Md. 2007) (citing <u>Walton v. Mariner Health</u>, 894 A.2d 584, 594 (Md. 2006)).

Typically, a court focuses on "the four corners of the agreement," and "the court should give effect to every clause so as not to disregard a meaningful part of the express language of the written contract." <u>Allegis Grp., Inc. v. Justin Jordan</u>, No. GLR-12-2535, 2016 WL 1077098, at *4 (D.Md. Mar. 18, 2016), <u>opinion vacated in part on reconsideration on other grounds sub nom.</u> <u>Allegis Grp., Inc. v. Jordan</u>, No. GLR-12-2535, 2017 WL 877271 (D.Md. Mar. 6, 2017) (quoting <u>Clancy v. King</u>, 954 A.2d 1092, 1101 (Md. 2008)). Even so, "[t]he circumstances of the instruments' drafting and the content of the written instruments provide guidance to interpret the scope of the parties' agreement." <u>Jaguar Land Rover N. Am., LLC v. Manhattan Imported Cars, Inc.</u>, 738 F.Supp.2d 640, 648 (D.Md. 2010), <u>aff'd</u>, 477 F.App'x 84 (4th Cir. 2012).

Under Maryland law, if several documents are "part of a single transaction" they "will all be read and construed together as evidencing the intention of the parties in regard to the single transaction." <u>Ford</u>, 117 A.3d at 27 (quoting <u>Rocks v. Brosius</u>, 217 A.2d 531, 545 (Md. 1966)). "This is true even though the instruments were executed at different times and do not in terms refer to each other." <u>Id.</u> at 27 (quoting <u>Rocks</u>, 217 A.2d at 545). In those instances, "the documents are to be construed together, harmoniously, so that, to the extent possible, all of the provisions can be given effect." <u>Rourke v. Amchem Prod.</u>, 863 A.2d 926, 941 (Md. 2004). Further, "a party who signs a contract is presumed to have read and understood its terms and as such will be bound by

its execution." <u>Koons Ford of Balt., Inc. v. Lobach</u>, 919 A.2d 722, 727 (Md. 2007) (citations omitted). The Court is "loath to rescind a conspicuous agreement that was signed by a party whom now, for whatever reason, does not desire to fulfill that agreement." <u>Id.</u> (citation omitted).

In this case, Flagstar maintains that the Revised LMA alone governs the parties' contractual relationship. The Barrs submit that the Court should read the Third TPP Agreement and the Second How to Accept Letter as part of the Revised LMA because both documents explicitly reference the Revised LMA. The Barrs argue that when these documents are read together with the Revised LMA, the agreement between the parties reflects that Flagstar agreed to accept $2,043.31 as the Modification Payment Amount, and that this amount included escrow payments.

The purpose of the Third TTP Agreement was to determine whether the Barrs were qualified for a permanent modification and to provide the Barrs immediate payment relief. (Def.'s Mot. Ex. C ["Third TPP"] at FLAG0024, ECF No. 11-4). The Third TPP Agreement expressly provides that if the Barrs "otherwise perform[ ] under the loan document" the "mortgage will be permanently modified <u>in accordance with the terms of your modification agreement.</u>" (<u>Id.</u> at FLAG0023) (emphasis added). This term shows that the parties did not intend for the Third TTP Agreement to govern the permanent loan modification. Rather, they intended for the terms of the modification agreement to govern any permanent modification of the Barrs' Loan. In addition, although the Third TPP Agreement employs the term "modification agreement," it does not incorporate by

reference the Revised LMA. Thus, the Court concludes that the Third TPP Agreement should not be read together with the Revised LMA.

Next, the Court concludes that it will construe the Second How to Accept Letter together with the Revised LMA for two reasons. First, Flagstar sent the Second How to Accept Letter and the Revised LMA to the Barrs at the same time. See Jaguar, 738 F.Supp.2d 640, 648 (D.Md. 2010), aff'd, 477 F.App'x 84 (4th Cir. 2012) (construing together three agreements that were sent to defendant at the same time). Second, the Second How to Accept Letter expressly provides the conditions for accepting the Revised LMA—returning two copies of the Revised LMA along with a certified check payable to Flagstar—and provides that the Revised LMA "will be effective when signed by [the Barrs] and Flagstar." (2d How to Accept Letter at FLAG0057). The Second How to Accept Letter shows Flagstar's intent not to be bound by the Revised LMA until these condition precedents were satisfied. The Court will, therefore, only consider the Revised LMA and Second How to Accept Letter in determining the parties' contractual obligations.

### b.      Breach of Contract Claim

The Barrs argue that because of Flagstar's prior representations that the Modification Payment Amount included escrow payments, the $2,043.31 Modification Payment Amount under the Revised LMA included escrow payments as well. The Court disagrees.

The language of the Revised LMA—the operative agreement between the parties—is clear and unambiguous: "Borrower also will comply with all other

covenants . . . including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, [and] escrow items . . . ." (Executed LMA at FLAG00108) (emphasis added). The payment schedule in the Revised LMA also states that $2,041.43 is only the Monthly Principal and Interest Payment Amount. (Id.; see also Revised LMA at FLAG0059). Escrow items are not included in the Modification Payment Amount. Further, neither the Revised LMA nor the Second How to Accept Letter contain any terms obligating Flagstar to accept $2,041.43 as the full monthly payment. While previous communications from Flagstar may have suggested that the escrow payments were included in the Revised LMA's Modification Payment Amount, the fact still remains that the Revised LMA expressly provides that the Barrs would be responsible for making all escrow payments in addition to the principal and interest payments on the mortgage. The Barrs executed the Revised LMA, and, therefore, are bound by its terms. See Koons Ford, 919 A.2d at 727.

Thus, the Court concludes that the Barrs fail to plausibly allege that Flagstar had a contractual duty to accept $2,041.43 as full payment under the Revised LMA. Accordingly, the Court will grant Flagstar's Motion to the extent that the Barrs' breach of contract claim is premised on Flagstar accepting their $2,041.43 payments only as partial payments.

### ii.    Common Law Fraud Claims (Count I)

In short, the Court concludes that it will dismiss the Barrs' first fraud claim premised on Flagstar's alleged misrepresentation regarding the Modification Payment

Amount. The Court will not dismiss the Barrs' second fraud allegation based on compliance with conditions to accept the Revised LMA.

To state a claim for fraud under Maryland law, the plaintiff must show:

> (1) a representation made by a party was false; (2) its falsity was known to that party or the misrepresentation was made with reckless indifference to truth; (3) the misrepresentation was made for the purpose of defrauding the plaintiff; (4) the plaintiff relied upon the misrepresentation and had the right to rely upon it with full belief of its truth; and (5) that the plaintiff suffered damage directly resulting from the misrepresentation.

Dean v. Beckley, No. CCB-10-297, 2010 WL 3928650, at *4 (D.Md. Oct. 1, 2010) (citing Suburban Props. Mgmt. v. Johnson, 204 A.2d 326, 329 (Md. 1964)). "To be actionable, a false representation 'must be of a material fact.'" Galante, 2014 WL 3616354, at *22 (quoting Gross v. Sussex, Inc., 630 A.2d 1156, 1161 (Md. 1993)). "A 'material' fact is one on which a reasonable person would rely in making a decision." Sass v. Andrew, 832 A.2d 247, 260 (Md.Ct.Spec.App. 2003).

Flagstar principally contends that the Barrs fail to plausibly plead the first element—false representation of material fact—because the Revised LMA explicitly states that escrow items must still be paid. The Court agrees.

The Barrs allege that Flagstar made a false representation of a material fact in the Second How to Accept Letter. (Am. Compl. ¶ 105). It stated that the Modification Payment Amount was $2,041.43, which the Barrs understood to include escrow payments based on previous correspondence from Flagstar. (Id.). As discussed above, the language of the Revised LMA is clear—it required the Barrs to make monthly escrow

payments in addition to the $2,041.43 Monthly Principal and Interest Payment. Because, when read together, the Second How to Accept Letter and the Revised LMA conflict with the allegations in the Amended Complaint, these documents prevail. See Fare Deals, 180 F.Supp.2d at 683 (citing Fayetteville Inv'rs, 936 F.2d at 1465). Thus, the Barrs fail to plausibly allege that Flagstar made a false representation of material fact related to whether escrow payments were included in the Modification Payment Amount.

The Barrs bring a second fraud claim, however. They allege that Flagstar misrepresented that their "loan would be modified if they complied with all conditions" required to accept the Revised LMA. (Am. Compl. ¶ 105). Because Flagstar does not address it in its Motion or Reply, the Court declines to address it here.

Accordingly, the Court will only dismiss the Barrs' first fraud claim, which is related to the Modification Payment Amount. The Barrs' second fraud allegation, related to compliance with conditions to accept the Revised LMA, will remain.

### iii.    MCPA Claims (Count II)

The Court concludes that it will dismiss the Barrs' MCPA claim premised on the Modification Payment Amount including escrow. The Court will not, however, dismiss the Barrs' remaining MCPA claims.

The MCPA prohibits unfair or deceptive trade practices in connection with "the extension of consumer credit"[4] or the "collection of consumer debts," CL §§ 13-303(4),

---

[4] The MCPA does not expressly define "extension of credit," but under the Maryland Credit Services Businesses Act (the "MCSBA") the term is defined as "the right to defer payment of debt or to incur debt and defer its payment, offered or granted primarily for personal, family, or household purposes." CL § 14-1901(f) (West 2018).

(5), which includes loan modifications, see Marchese v. JPMorgan Chase Bank, N.A., 917 F.Supp.2d 452, 466 (D.Md. 2013). To state a claim under the MCPA, a plaintiff must adequately plead that: "(1) the defendant engaged in an unfair or deceptive practice or misrepresentation, (2) the plaintiff relied upon the misrepresentation, and (3) doing so caused the plaintiff actual injury." Palermino, 2015 WL 6531003, at *2 (citing Currie v. Wells Fargo Bank, 950 F.Supp.2d 788, 796 (D.Md. 2013)). Unfair or deceptive trade practices are defined, in relevant part, as any: "False . . . or misleading oral or written statement . . . or other representation . . . which has the capacity, tendency, or effect of deceiving or misleading consumers; [and] failure to state a material fact if the failure deceives or tends to deceive . . . ." CL §§ 13-301(1), (3). Because an MCPA claim sounds in fraud, it is subject to Rule 9(b)'s heightened pleading standard. Spaulding v. Wells Fargo Bank, N.A., 714 F.3d 769, 781 (4th Cir. 2013).

Flagstar asserts two principal arguments for dismissal of the Barrs' MCPA claim premised on the Modification Payment Amount. First, Flagstar argues that the Barrs fail to establish that Flagstar made a false or deceptive representation that the Modification Payment Amount included escrow. Second, Flagstar contends that the Barrs' allegations fail to satisfy Rule 9(b)'s heightened pleading standard. The Court agrees.

Similar to their common law fraud claim, in their MCPA claim, the Barrs allege that Flagstar violated the MCPA when it made false statements in "communications" that Flagstar would accept $2,041.43 as the Modification Payment Amount. (Am. Compl. ¶ 113). This alleged MCPA violation fails for the same reasons as the Barrs' common law fraud claim. The language of the Revised LMA is clear—the Barrs were

still required to make escrow payments. (Executed LMA at FLAG00108). The Barrs, therefore, cannot plausibly plead that Flagstar made a false statement. See Spaulding, 714 F.3d at 781 (affirming dismissal of plaintiff's MCPA claims because defendant's statements "were demonstrably <u>not</u> false").

The Barrs also claim that Flagstar violated § 13-301(3) of the MCPA "by failing to disclose material facts." (Am. Compl. ¶ 115). This allegation is not sufficiently specific to pass muster under Rule 9(b). It does not "describe the time, place, and contents of the false representations." <u>Galante</u>, No. ELH-13-1939, 2014 WL 3616354, at *9 (quoting <u>United States ex rel. Owens</u>, 612 F.3d at 731). Thus, the Court concludes that the Barrs fail to plausibly allege that Flagstar engaged in an unfair or deceptive practice related to the Modification Payment Amount.

The Barrs allege two additional bases for their MCPA claim. First, the Barrs assert that Flagstar sent them communications stating that they "owe different sums due." (Am. Compl. ¶ 113). Second, the Barrs allege that Flagstar violated the MCPA when it "fail[ed] to honor the Revised [LMA]." (<u>Id.</u>). Flagstar does not argue that the Court should dismiss these claims. The Court, therefore, does not address these alleged MCPA violations. Accordingly, the Court will grant Flagstar's Motion only to the extent that the Barrs' MCPA count is premised on the Modification Payment Amount including escrow payments.

#### iv.    Maryland Mortgage Fraud Protection Act Claims (Count III)

In brief, the Court will dismiss the Barrs' MMFPA claim premised on Flagstar misrepresenting the Modification Payment Amount, but the Court will not dismiss the Barrs' remaining MMFPA claims.

The MMFPA prohibits mortgage fraud during the mortgage lending process. RP § 7-401(d) (West 2018).  The "mortgage lending process" includes servicing the loan. Id. § 7-401(e)(2); Stovall v. SunTrust Morg., Inc., No. RDB-10-2836, 2011 WL 4402680, at *10 (D.Md. Sept. 20, 2011) (explaining that the MMFPA encompasses conduct in connection with a mortgage loan closing, as well as "post-closing servicing activities").  To state an MMFPA claim, the plaintiff "must plead the elements of a common law fraud claim."  Galante, 2014 WL 3616354, at *28 (citing Castle v. Capital One, N.A., 2014 WL 176790, at *5 (D.Md. Jan. 15, 2014)).

Flagstar argues that because the Barrs fail to allege the elements of common law fraud, the Barrs also fail to state an MMFPA claim.  The Barrs counter that they plausibly state a claim under the MMFPA because they have "properly alleged the elements of common law fraud."  (Pl.'s Opp'n at 23).  The Court agrees with Flagstar.

The Barrs allege that Flagstar violated § 7-401(d) of the MMFPA by making deliberate misrepresentations or omissions regarding the Modification Payment Amount. (Am. Compl. ¶ 126).  This alleged violation of the MMFPA fails for the same reasons as the Barrs' common law fraud claim and MCPA claim related to the Modification Payment Amount—the Barrs cannot plausibly allege that Flagtar misrepresented the Modification Payment Amount.  See Galante, 2014 WL 3616354, at *29 (concluding that

plaintiffs' MMFPA claim failed they did not sufficiently allege an element of both a fraud and an MCPA claim—reliance). Thus, the Court concludes that the Barrs fail to state an MMFPA claim premised on the Modification Payment Amount.

The Barrs also claim that Flagstar violated § 7-401(d) of the MMFPA by making deliberate misrepresentations or omissions regarding the unpaid balance of the Barrs' mortgage and monthly payment amounts. (Am. Compl. ¶ 126). The Barrs further allege that Flagstar violated the MMFPA when it provided loan documents that contained misstatements in response to the alleged QWRs. (Id.). Flagstar does not address any of these allegations. The Court, therefore, will not dismiss these claims.

Accordingly, the Court will grant Flagstar's Motion to the extent that the Barrs' MMFPA claim is based on misrepresentations or omissions regarding the Modification Payment Amount.

### v. Real Estate Settlement Procedures Act Claims (Count IV)

At bottom, the Court concludes that the Barrs fail to state a RESPA claim.

RESPA requires the servicer of a federally related mortgage loan to acknowledge receipt of a QWR within five business days of receipt. 12 U.S.C. § 2605(e)(1)(A) (2018); 12 C.F.R. § 1024.35(d) (2014). Thereafter, within thirty business days, the servicer must: (1) make corrections to the borrower's account; (2) after conducting an investigation, provide a written explanation stating the reasons the servicer believes the account is correct; or (3) conduct an investigation and provide the information requested by the borrower or an explanation of why the information is unavailable. 12 U.S.C. § 2605(e)(2). In the event a servicer fails to comply with this requirement,

RESPA authorizes a plaintiff to recover actual damages "as a result of" the servicer's failure. Id. § 2605(f)(1)(A).

To state a claim under RESPA's QWR provisions, a plaintiff must allege: "(1) a written request that meets RESPA's definition of a QWR, (2) the servicer failed to perform its duties, and (3) actual damages." Thomas v. Ocwen Loan Servicing, LLC, No. CV ELH-17-218, 2017 WL 2645721, at *6 (D.Md. June 19, 2017) (quoting IAR Family Tr. v. Suntrust Mortg., Inc., 3:13-CV-418-GCM, 2014 WL 1432378, at *3 (W.D.N.C. Apr. 14, 2014)).

A QWR is

> a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that includes, or otherwise enables the servicer to identify, the name and account of the borrower; and includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B). A plaintiff may, therefore, satisfy § 2605(e)(1)(B)'s requirements for a valid QWR in two ways: (1) requesting information related to the servicing of the plaintiff's loan; or (2) alleging an accounting error with plaintiff's loan. See Martins v. Wells Fargo Bank, N.A., No. CCB-16-1070, 2016 WL 7104813, at *5 (D.Md. Dec. 6, 2016) (quoting McDonald v. OneWest Bank, FSB, 929 F.Supp.2d 1079, 1095 (W.D. Wash. 2013)). The correspondence need not have "magic language" to constitute a QWR. Catalan v. GMAC Mortg. Corp., 629 F.3d 676, 687 (7th Cir. 2011).

But the correspondence must relate to servicing.  Dides v. Ocwen Loan Servicing, LLC,

No. WMN-12-2989, 2013 WL 2285371, at *2 (D.Md. May 21, 2013).  Servicing means

> receiving any scheduled periodic payments from a borrower
> pursuant to the terms of any loan, including amounts for
> escrow accounts described in section 2609 of this title, and
> making the payments of principal and interest and such other
> payments with respect to the amounts received from the
> borrower as may be required pursuant to the terms of the
> loan.

12 U.S.C. § 2605(i)(3).

By contrast, correspondence regarding the validity of a loan does not relate to

servicing.  See Minson v. CitiMortgage, Inc., No. DKC 12-2233, 2013 WL 2383658, at

*4 (D.Md. May 29, 2013) (citing Ward v. Sec. Atl. Mortg. Elec. Registration Sys., 858

F.Supp.2d 561, 574–75 (E.D.N.C. 2012)).  For example, requests for "copies of loan

documents, assignments of the deed of trust and promissory note and copies of property

inspection reports and appraisals and a loan transactional history" do not relate to

servicing, and, therefore, do not constitute a valid QWR.  Id. (citing Junod v. Dream

House Mortg. Co., No. CV 11-7035-ODW, 2012 WL 94355, at *3–4 (C.D. Cal. Jan. 5,

2012)).

The Barrs plead violations of RESPA based on the December 2015 Letter and the

March 2016 Letter, which the Barrs allege are QWRs.  As to both, the Barrs allege that

Flagstar failed to: (1) correct the errors they identified in the letters; and (2) "fully

respond" to the letters' requests or "provide the requested documentation."  (Am.

Compl. ¶ 132).  The Court addresses each letter in turn.

### a.     The December 2015 Letter

Flagstar argues the December 2015 Letter is not a QWR because it: (1) demands information unrelated to the servicing of their loan; and (2) does not specifically identify any errors related to the servicing of the loan.  The Barrs counter that they specifically identified the error; the Barrs to do not address Flagstar's first argument.  The Court agrees with Flagstar.

Here, although the Barrs title the December 2015 Letter a "QWR Request" and cite specifically to RESPA, the substance of the letter requests an extensive amount of documents, including the Initial Loan Application and Final Loan Application, a copy of the original promissory note, a copy of the complete loan payment history, all escrow analyses conducted on the account, Truth in Lending Statements and Disclosures, all loan servicing agreements, and appraisals.  (Dec. 15, 2015 Letter at FLAG00162–63).  Such information falls outside the scope of information related to the servicing of the Barrs' loan.  See Minson, 2013 WL 2383658, at *4 (concluding that a letter seeking, among other documents, "copies of loan documents, assignments of the deed of trust and promissory note and copies of property inspection reports and appraisals and a loan transactional history" did not constitute a QWR).

With regard to identifying an error with the Barrs' account, the Barrs wrote in their December 2015 Letter that "recent mortgage account statements do not accurately reflect payments we've continued to remit pursuant to our loan modification agreement." (Dec. 15, 2015 Letter at FLAG00161).  This "bare assertion" does not provide "sufficient detail" as to why the Barrs believed their account statements were incorrect.  See Willis

v. Bank of Am. Corp., No. ELH-13-02615, 2014 WL 3829520, at *31 (D.Md. Aug. 1, 2014) (concluding that the statement "I am disputing the entire debt of $348,453.81 included in your April 28, 2009 letter" did not provide sufficient detail to allege an error). Thus, the Court concludes that the December 2015 Letter does not constitute a valid QWR.

### b.    The March 2016 Letter

Flagstar concedes that the March 2016 Letter requested information related to the servicing of their loan. Nevertheless, Flagstar argues that it properly responded to the March 2016 Letter. The Court agrees.

Based on the information the Barrs' requested, Flagstar was required to provide the following information from January 1, 2015 to March 1, 2016: (1) the date Flagstar received each payment; (2) the amount of each payment; (3) a breakdown of how each payment was applied to the principal, interest, escrow, fees, and charges and the amount sent to any suspense or unapplied funds account; (4) the date, amount, and destination of payments that were applied from a suspense or unapplied funds account; and (5) documents relating to the rejection of any payment. (Mar. 1, 2016 Letter at FLAG00205). Flagstar was also required to respond to the alleged error with the Barrs' account. On April 1, 2016, Flagstar sent the Barrs its response, which included 233 pages of documents. (2d Resp.).

The Court has reviewed Flagstar's response, and the Court concludes that Flagstar fully responded to the Barrs' requests for information and notice of error. Flagstar provided a detailed account history covering January 15, 2015 through the date of the

response, as well as an accounting of the escrow account and description of the late fees and suspense account payments. (Id. at FLAG00379–95). Although Flagstar did not correct what the Barrs frame as an "error," Flagstar states that it "researched the issue and found that no error occurred." (Id. at FLAG 00215). Flagstar goes on to explain that the Loan was approved for a modification, but that Flagstar had not modified the Loan because Flagstar had not received the Corrected LMA. (Id.). Flagstar, therefore, satisfied its statutory obligation to respond. See 12 U.S.C. § 2605(e)(2).

Thus, the Barrs fail to plausibly state a violation of RESPA based on the March 2016 Letter. Accordingly, the Court will grant Flagstar's Motion as to the Barrs' RESPA claims.

### vi.    Maryland Consumer Debt Collection Act Claim (Count V)

At bottom, the Court concludes that it will dismiss the Barrs' MCDCA claim against Flagstar.

Under the MCDCA, a debt collector may not "claim, attempt, or threaten to enforce a right with knowledge that the right does not exist." CL § 14-202(8) (West 2018). To state a claim under the MCDCA, a plaintiff must establish two elements: (1) the defendant "did not possesses the right to collect the amount of debt sought"; and (2) the defendant "attempted to collect the debt knowing that they lacked the right to do so." Lewis, 2014 WL 3845833, at *6 (citing Pugh v. Corelogic Credco, LLC, No. DKC 13-1602, 2013 WL 5655705, at *4 (D.Md. Oct. 16, 2013)).

To prevail on an MCDCA claim, the plaintiff must demonstrate that the defendant "acted with knowledge as to the invalidity of the debt." Lindsay v. Rushmore Loan

29

Mgmt., Servs., LLC, No. PWG-15-1031, 2017 WL 1230822, at *6 (D.Md. Apr. 4, 2017) (quoting Pruitt v. Alba Law Grp., P.A., No. DKC-15-0458, 2015 WL 5032014, at *3 (D.Md. Aug. 24, 2015)). A debt can be considered invalid if a debt collector seeks to collect an amount that exceeded the amount owed "as a result of the debt collector's inclusion of an unauthorized charge." Conteh v. Shamrock Cmty. Ass'n, Inc., 648 F. App'x 377, 381 (4th Cir. 2016); see also Allstate Lien & Recovery Corp. v. Stansbury, 101 A.3d 520, 529–30 (Md.Ct.Spec.App. 2014) (holding that debt collector's addition of unauthorized $1,000 lien-processing fee constituted seeking to enforce a right that did not exist for purposes of § 14–202(8) even though the underlying debt was valid). But, "a dispute over the amount owed is not a challenge to the validity of the underlying debt." Lindsay, 2017 WL 1230822, at *7.

Flagstar argues that the Barrs cannot plausibly allege Flagstar knew the loan was invalid. The Barrs counter that after entering into the Revised LMA, Flagstar continued to attempt to collect past due payments, late fees, and a per month payment they did not owe. The Court agrees with Flagstar.

In this case, the Barrs allege that Flagstar violated § 14-202(8) of the MCDCA by sending notices claiming the Barrs "owe more than is actually due and which do not give [the Barrs] credit for the sums paid" because the Barrs are current on their loan based the Revised LMA. (Am. Compl. ¶ 139). The Barrs do not dispute the validity of the underlying debt, nor do they claim that the amounts Flagstar sought to collect exceed the amount owed "as a result of the debt collector's inclusion of an unauthorized charge." See Conteh, 648 F.App'x 377 at 381. Rather, the Barrs dispute the amount owed, and

this is not sufficient to state a MCDCA claim.  <u>See Lindsay</u>, 2017 WL 1230822, at *7. Thus, the Court concludes that the Barrs do not sufficiently allege their MCDCA claim. Accordingly, the Court will grant Flagstar's Motion as to the Barrs' MCDCA claim.

### III.    CONCLUSION

For the forgoing reasons, the Court will grant Flagstar's Motion to Dismiss (ECF No. 11).  The Court will grant the Motion as to Count VI of the Amended Complaint to the extent that it is premised on Flagstar's failure to accept $2,041.43 as full payments. The Court will also grant Flagstar's Motion as to Counts I, II, and III of the Amended Complaint to the extent that those counts are based on the statement that the $2,041.43 Modification Payment Amount included escrow payments.  Finally, the Court will grant Flagstar's Motion as to Counts IV and V of the Amended Complaint.

Entered this 27th day of March, 2018.

/s/

_____
George L. Russell, III
United States District Judge